UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**U.S. ex rel GRAY**                              **CIVIL ACTION**

**VERSUS**                                        **NO: 05-4201**

**LOCKHEED MARTIN CORPORATION**                   **SECTION: B(2)**

## ORDER AND REASONS

Before the Court is Defendant's Motion for Partial Summary Judgment as to all False Claims Act Qui Tam Causes of Action (Count I) asserted by Relator Jeffrey Gray (Rec. Doc. No. 126). The Motion is opposed. A reply brief has also been filed (Rec. Doc. No. 165). For reasons discussed during oral argument and for the following reasons, the Motion for Partial Summary Judgment as to all False Claims Act Qui Tam Causes of Action(Count I) (Rec. Doc. No. 126) is **GRANTED.**

## BACKGROUND

Gray was a nineteen year employee at Lockheed Martin Michoud Space Systems("LMMSS") (formerly Martin Marietta) at the Michoud Assembly Facility ("MAF"). He has an extensive background in nondestructive evaluation ("NDE") of foam materials. He was a task leader on NDE of foam material in the late 80s after the Challenger accident. He also wrote specifications for thermal imaging equipment, which was originally intended for defect detection in foam materials. (GRAY I at 271).

For the last seven years of Gray's employment at LMMSS, he

worked in the research and development group of the operations lab, under the supervision of John Spencer. (Spencer at 15,16). Mr. Spencer's educational background is a Bachelor's degree from UNO in chemistry. He reported to the chief of the laboratory, Laurie Rando. Mr. Rando reported to Ralph LeBoeuf, manager of the lab. Mr. LeBoeuf's educational background is a Bachelor's degree in biology, with no graduate work. (LeBoeuf I at 13). Gray was also educated at UNO. He has a Bachelor's degree in electrical engineering and a Master's degree in engineering, which he received in 1986. Since being terminated by LMMSS Gray has furthered his post-graduate work by achieving his PhD in engineering and applied sciences from UNO.

Gray was a subject matter expert in measurement technology at LMMSS. His areas of expertise were in dimensional measurement and diagnosis of the static and dynamic performance of tooling and measurement machines.

Lockheed Martin denied the fact that Gray in 2004 was an expert in dimensional measurement. (Exhibit 39, page 26). Gray's supervisor for the last seven years of his employment at LMMSS was better positioned to assess Gray's expertise.

After the Columbia accident on January 16, 2003, Gray was assigned to be the NDE representative at the dissection of the tanks. After the accident, the existing tanks were brought back to MAF and dissected to determine if there were additional

defects in the foam material. (GRAY I at 271). Wanda Sigur, Director of Engineering, LMMSS, asked Gray to invent a way to measure strain in the external tank ("ET") foam. Gray came up with the optical strain-gauge methodology.

A strain gauge is applied to material and stretches with the material as it moves, while measuring the strain on the material. Gray believed that nearly every case in which the foam fell off the ET during take-off was a result of the inability of the foam to withstand dimensional loading, such as contraction, torsion, and/or tension that can occur during "tanking" operations. Tanking refers to filling the tank with liquid fuel prior to launch.

Lockheed Martin fired Gray in September of 2004. This was in the midst of its RTF work on the ET foam loss. Gray alleges that Lockheed Martin fired its expert in this area in the middle of the task because Gray complained that the work in the lab was not being done in compliance with the contractual requirements. Prior to his firing, Gray had made numerous complaints about alleged fallacious testing and reporting of false data.

He had also made three threats to take action against Lockheed-Martin if the bad testing situations were not corrected or he was fired. As a result of the threats, dishonesty, and insubordination, Gray was terminated on September 8, 2004 and this lawsuit followed.

**DISCUSSION**

**A. Standard of Review for Summary Judgment**

Summary judgment is available if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. of Civ. P. 56. The moving party has an initial burden of demonstrating the absence of a genuine issue of material fact. *Imperial Trading Co., Inc. v. Travelers Prop. Cas. Co. of Am.*, 638 F.Supp.2d 692, 696 (E.D. La. 2009); *See also*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Summary judgment is improper if a disputed material fact exists, which is defined as a fact that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Once the moving party establishes that insufficient evidence is within the record to support an essential element of the opposing party's claim, the burden shifts to the non-moving party. 638 F. Supp.2d at 693-94. The non-movant must then demonstrate that an issue of fact does exist, by identifying specific facts on the record or by submitting additional evidence. *Id.* at 694. Summary judgment is appropriate if "no reasonable trier of fact could find for the nonmoving party." *Id.* at 693.

**A. Elements of Liability under the False Claims Act**

4

Gray's complaint places all of his allegations under the umbrella of a single "count" for violations under the "False Claims Act ("FCA")." There are a number of provisions of the FCA, and it is not clear which of them Gray means to invoke. He appears to claim that Lockheed Martin violated 31 U.S.C. Sec. 3729(a)(1) by knowingly presenting or causing to be presented false claims to NASA (Rec. Doc. No. 116 at 13-17), that Lockheed Martin violated 31 U.S.C. Sec. 3729(a)(2) by knowingly making, using, or causing to be made or used false statements or records to get NASA to pay false claims; and that Lockheed Martin violated 31 U.S.C. Sec. 3729(a)(7) by knowingly making or using a false record or statement to conceal or avoid an obligation to pay NASA. *Id.*

Under subsection (a)(1), a relator must show that (1) defendant made a claim against the Government; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent. *See U.S. ex. rel. Taylor-Vick v. Smith,* 513 F.3d 228, 230 (5th Cir. 2008). The subsection requires "a plaintiff to prove that defendant presented a false or fraudulent claim to the government." *Allison Engine Co., Inc. V. U.S. ex rel. Sanders,* 128 S. Ct. 2123, 2129 (2008).

Although § 3729(a)(1) requires that the defendants presented a false claim to the government, the Fifth Circuit does not require copious details about the claim in order to meet the Rule 9(b) standard. In *United States ex rel. Grubbs v. Kanneganti*, the

5

relator filed a complaint that alleged a scheme of fraudulent billing of Medicare and Medicaid, as well as at least one overt act of false billing for each defendant. 565 F.3d at 184-85. Each listing of acts made reference to a false claim, but did not provide extensive details about it. Hearing a challenge to whether the relator had met the Rule 9(b) standard, the court held that "Rule 9(b)'s ultimate meaning is context-specific," *Id.* at 188 (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir.1997)), and that "[i]t is adequate to allege that a false claim was knowingly presented regardless of its exact amount ..." *Grubbs*, 565 F.3d at 189.

Under subsection (a)(2), a relator must establish that (1) defendant made a record or statement that was material to the Government's decision to pay money; (2) the record or statement was false or fraudulent; and (3) the defendant knew it was false or fraudulent. *See U.S. ex rel Farmer v. City of Houston,* 523 F.3d 333, 338 (5th Cir. 2008).

The reverse FCA provision, 31 U.S.C. § 3729(a)(7), imposes liability when a party "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." To prove a reverse false claim violation, the Government must demonstrate that: (1) Lockheed had an obligation to pay money to the Government; (2) Lockheed used a false statement to

avoid or decrease the obligation; (3) the false statement was material; and (4) Lockheed made the false statement knowingly. 31 U.S.C. § 3729(a)(7); see also *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648 (5th Cir.2004) (construing Section 3729(a)(7)); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir.2003); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir.2004).

All of these FCA subsections have several common elements of liability, including falsity, scienter, and materiality. *See U.S. ex rel. Longhi v. Lithium Power Tech Inc.*, ___F.3d___, 2009 WL 195929 at *6 (5th Cir. 2009).

### B. False Claim or False Statement

Mere identification of a claim is not enough. A false claim is one grounded in fraud which might result in financial loss to the government. *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 379 (5th Cir. 2004).

In his complaint, Gray sets forth five claims, each alleging that Lockheed Martin defrauded NASA.

### 1. Claim I- Certification of the Terahertz Imagine System

In his first claim, Gray alleged that the RTF project's terahertz imaging system was "falsely certified." (SSAAC at 13). Gray claims this violated paragraphs 1 and 2 of the 31 U.S.C. Sec. 3729 of the False Claims Act. Gray claims, that the content of the

7

fraud was the failure to meet the contract requirements of detecting internal holes in the foam insulation by knowingly making false claims on volume detections by a system that only measured the thickness of the holes in the foam insulation. *Id.* Gray further claims that the purpose of Lockheed making these false claims to NASA and the U.S. is to make them believe the foam insulation of the space shuttle's external tank was safer than it actually was.

Defendant, Lockheed alleges that his claim is based upon "discussions about critical defect volumetric sizes... with cognizant engineers." (Gray I at 54). However, the record reflects that upon further questioning Gray admitted that he does not actually "recall specific discussions." (Gray I at 54). He also, does not know "specifically" when the fraudulent activity occurred. (Gray I at 55). In addition, testimony from NASA shows that the fraud alleged did not occur as Dr. Davis refuted Gray's claim by stating "I know that the system was not certified and was not claimed to be certified and that everyone knew it was not a certified system nor was it required to be certified for return to flight." (Davis, at 80, 90). NASA's Michael Smiles explained that "at no point in time did we ever expect to have it certified for use... we knew those –those inspection techniques were not going to be certified in time for Return-to-Flight." (Smiles at 69).

Smiles agree with Warren Ussery's[1] assessment that Lockheed Martin never stated that the techniques were qualified," and that numerous documents were submitted that stated that "the techniques are not certified." (Smiles at 70).

The Court finds based on the evidence provided that while Gray maintains that Lockheed Martin falsely certified the RTF project's terahertz imaging system he never addresses NASA's testimony establishing that this system did not require certification and that the fraud alleged by Gray never occurred.

**2. Claim 2- Ice Forming On Specimens**

In his second claim, Gray alleges that he observed from May 2004 to August 2004 in the Materials and Processes section of the Technology Laboratories at Michoud Assembly facility, New Orleans, Louisiana that the American Standards Test Methods (ASTM) accuracy required by NASA under the RTF contract was not met because Lockheed allowed specimens to be contaminated with an ice coating. (Rec. Doc. No. 17 at 14-15). The ice contamination makes the specimen measure stronger than an uncontaminated specimen. *Id.* This claim resulting from the ice formations on foam specimens resulted in a false working database of the material strength of the foam materials violating the contract for evaluating foam

---

[1] Mr. Ussery was the Lockheed Martin engineer responsible for Non-Destructive Evaluation of Return to Flight activities (Deposition of William "Warren" Ussery ("Ussery") at 8-9).

tensile strength. *Id.*

However, Defendant argues that Gray's testimony is contradictory as he cannot recall specific dates of when this alleged ice formation occurred (Gray I at 60) and then that he doesn't "believe the labs were engaged in fraud." (Gray IV at 80). Lockheed's Michael LeBlanc, the lab technician who oversaw specimen testing testified in his deposition that he never witnessed ice formation on tensile specimens during this testing. (LeBlanc at 29).

Gray argues that it has been shown that the formation of ice is a logical consequence of the method under which multiple specimens are tested. Gray contends that the severity of the falsity is shown by conservative estimates of the effects on ice on true tensile strengths. The data was reviewed by NASA and engineering decisions were made on false data. Even though Gray has not mustered any support for his above allegations of ice on the testing specimens, Lockheed Martin took the allegation seriously. In response to Gray's ice formation allegation, Ralph LeBoeuf spoke with engineers, talked to the technicians, and tried to reproduce the situation described by Gray. (LeBoeuf at 29). "We were never able to reproduce that situation," he explained, "and that was never observed by anyone." (LeBoeuf at 29). LeBoeuf further explained that "numerous audits" of the testing were performed by Lockheed Martin's quality department, some in the

presence of personnel from NASA's Marshall facility and the Inspector General. (LeBoeuf at 29-30). Despite these efforts, audits, and demonstrations, no one ever recreated the ice formation that Gray describes: "I went through several iterations with the people in the lab to demonstrate to me that ice was not forming in the specimens in the box." (LeBoeuf at 206). Gray has failed to demonstrate any fraud on Lockheed Martin's part.

### 3. Claim 3- Calibration of a Tensile Testing Machine

In his third claim, Gray alleges that Lockheed Martin fraudulently continued to use a tensile testing machine after Gray claimed that it was malfunctioning and not in compliance with American Society for Testing and Materials ("ASTM") standards accuracy requirements. (Rec. Doc. No. 116 at 15). Gray claims that the false claim is knowingly using data for a malfunctioning system without properly quantifying the impact of the malfunction on the data. *Id.*

Defendants allege that while Gray continues to allege that "there is fraud" he was and is unable to come up with any list, explaining that, "well I have to see the actual reports, I won't know until I look at them." (Gray I at 190). Defendant's argue that the apparent impetus for this claim is that Gray was upset that it appeared that reading of an extensometer, in this particular matter, tension, seemed to be different than the

11

measurements taken on the specimens themselves. (LeBoeuf at 22). However, Gray's concern was misplaced and irrelevant to accuracy as the actual test results were accurate as LeBoeuf "verified [them] not only with the people in the M&P laboratory itself," but also with "material science engineers." (LeBoeuf at 24). Further NASA's explanation, Lockheed Martin argues, confirms that Gray is completely wrong is this matter. Gray informed NASA of the facts of his third claim (Gray I at 126), and NASA agreed with Lockheed Martin that Gray's concerns were unjustified. (Coleman I at 91). In fact, in NASA's opinion Lockheed Martin could not have falsely represented tensile test machine results because "Lockheed Martin quality inspectors and Defense Contract Administration Services Agency of the Department of Defense inspectors all participate" in the qualification of the tensile test machine. (Davis at 98). There appears to be no fraud, just that Gray was simply upset that NASA was not using his technology.

### 4. Claim 4- Limits on the "Open Exchange of Expert Knowledge"

Gray's fourth claim is that he was prevented from communicating with other cognizant engineers about the questions of accuracy. As a result false statements about accuracy were promulgated and the mistakes were never corrected. Gray contends that the engineers continued to use inaccurate data and a false database of critical defect divots were assembled.

12

Gray's fourth claim states that he was told by a Lockheed Martin Superior that he should not communicate with another Lockheed Martin engineer, Graham Rashleigh. (SSAAC at 16). Gray does not identify how the instruction is illegal or results in a false claim to the government, and second, since Gray "violated the verbal order not to talk to another engineer" how anything false or otherwise resulted from that order. (Gray I at 86).

At Gray's deposition, Gray was asked to explain how his fourth claim resulted in fraud. His response danced around the issue:

> Why don't we dance around this a few more minutes. I might get you to understand... The false claim here is that material sciences department represented data they had taken to be accurate representations of the voids. The false claim or action which lead to - give me a minute. The action which exacerbates the false claim is the prevention of accurate technical knowledge being disseminated from experts to end users, and instead of being interpreted by individuals who are not competent or qualified to make statements about accuracy.

(Gray I at 89-90).

Gray argues that he was instructed not to speak with another Lockheed Martin engineer, but he never begins to explain how this instruction could be actionable under the FCA. The Court finds that Gray has not identified any false statements about accuracy of testing, false data, or information that was given to NASA.

### 5. Claim 5- The Withholding of Information Concerning the "True Capabilities" of Gray's Technology

In his fifth complaint, Gray claims that Lockheed Martin withheld "critical information from NASA relevant to the true

capabilities of the optical technologies" he claimed to develop. (SSAAC at 16). Defendant maintains that the library of NASA depositions in this case shows this claim is not true. Every NASA witness testified that Gray had repeated opportunities to express all of his ideas to NASA without interference from Lockheed Martin (Coleman I at 88, 96, Thom at 34, Smiles at 51, 72; Davis at 54, 85-86; J. Walker at 10-11; A. Walker at 22-23). As NASA projects Manager Sandy Coleman noted, Gray was permitted to present his technology to "[e]very level of NASA" at her disposal, (Coleman I at 88), and had "every opportunity to explain his... concept" (Coleman I at 89, see also Coleman II at 278 ("I think they gave him an opportunity to explain it up through the Lockheed Martin ranks and ... they certainly gave him the opportunity ... to explain his technology to NASA.")). Gray even admitted in his deposition that he was allowed "full disclose" to NASA of the facts concerning his technology, (Gray I at 40, 42), and that "[t]here were no restrictions" imposed by Lockheed Martin with respect to Gray's communications and meetings with NASA (Gray I at 98, 101).

Defendants finally contend that after years of Gray alleging that Lockheed Martin defrauded NASA by knowingly violating its contract and submitting false claims, he has provided no description of what any particular contract requirement might have been, how exactly Lockheed Martin might have been out of compliance with the Contract, how any contractual noncompliance might have

14

generated a specific false record or statement, or how any specific false record or statement might have been used to get a false claim paid. Each of these omissions requires summary judgment of Gray's *qui tam* claims.

After going through each of Gray's claims, it is apparent that he has not met his burden of demonstrating a material issue of fact with regards to a false claim or false statement much less any actual claim for payment. *U.S. ex rel Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 379 (5th Cir. 2004)("a false claim is one grounded in fraud which might result in financial loss to the government."). In fact, instead of offering evidence supporting elements of FCA liability, Gray contends that Lockheed Martin defrauded NASA by failing to tell NASA about the technology that Gray developed at the Government's expense. The undisputed facts show that Gray's allegations are not true. (See Coleman I at 88-89). Gray was permitted to present his technology to "every level of NASA," (Coleman I at 88-89) and had "every opportunity to explain his ... concept." (Coleman I at 89; Thom at 34; Smiles at 51, 72; Davis at 54, 85-86; J. Walker at 10-11; A. Walker at 22-23) (all noting Gray's discussions with NASA about his technology).

As the Fifth Circuit has stated, although presentment of a false claim is not required for actions under [Section 3729(a)(2)]... proof of a false claim is required and under Gray's alleged facts, no sufficient false claim has been identified to

15

prevent summary judgment. *U.S. ex rel. Rafizadeh v. Continental Commons, Inc.*, 553 F.3d 869, 874 n. 9 (5th Cir. 2008).

In addition, to evidence of an actual false claim, subsections (a)(2) and (a)(7) also require a plaintiff to identify a "document at issue containing false and fraudulent information and to link that document with a false claim or concealed obligation. *U.S. ex rel. Longhi v. Lithium Power Tech., Inc.*, 2009 WL 1959259 (5th Cir. 2009). Gray has failed to identify any such document. During Gray's deposition he was asked to identify "any specific false statement by anyone at Lockheed Martin" that was "going to be sued to influence NASA to pay a particular invoice." (Gray I at 155). Gray responded: "I personally don't remember a specific incident. That's not to say they don't exist." (Gray I at 155). NASA's Coleman, however, testified that they do not exist. (Coleman II at 261-62 (There was nothing that Lockheed kept from us because we were intimately involved in ... the whole process.")). It is not enough for Gray to speculate that false documents exist or that false statements were made; "testimony based on conjecture alone is insufficient to raise a genuine issue of material fact." *Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986).

**C. Gray Cannot Establish Scienter**

A violation of the False Claims Act requires scienter. *U.S. ex rel. Farmer v. City of Houston,* 523 F.3d 333, 337 (5th Cir.

16

2008).  A relator cannot survive summary judgment by submitting evidence of false claims; he must have evidence that the defendant knowingly or recklessly cheated the government.  *U.S. ex rel. Taylor-Vick v. Smith et al., 513 F.3d 228, 232 (5th Cir. 2008).*

Gray believes that everyone at Lockheed Martin and NASA were wrong about his technology.  However, this does not amount to fraud- it was, as NASA employees explained, a "difference of opinion." (Smiles exhibit 8; Davis at 59; Smiles at 53).  The legal process is not suited to resolving scientific disputes or identifying scientific misconduct.  *U.S. ex rel. Milam v. Regents of Univ. of Calif.,* 912 F. Supp. 868, 886 (D. Md. 1995). Disagreements over scientific methodology do not give rise to False Claims Act liability.

In this case, NASA's Sandy Coleman noted that Lockheed Martin and NASA worked side by side on all the testing and all of the evaluation that went into the redesign of the external tank. (Coleman I at 32; Coleman II at 253-54).  Coleman noted how she even moved her NASA team to New Orleans so that they could work "hand in hand" with the Lockheed Martin employees. (Coleman II at 253-54).  This kind of collaboration was "quite unusual in the whole history of the space shuttle team." (Coleman II at 254). Courts recognize that where the government and a contractor have been working together to reach a common solution to a problem no FCA claim arises. *U.S. ex rel. Laird v. Lockheed Martin Eng'g and*

17

*Sci. Servs. Co.,* 491 F.3d 254, 262-63 (5th Cir. 2007). This is because such a close working relationship negates the required scienter. *Id.*

Every NASA witness acknowledges that NASA was fully informed of Gray's information. (Coleman I at 88, 96; Thom at 34; Smiles at 51, 72; Davis at 54, 85-86; J. Walker at 10-11; A. Walker at 22-23.). Thus, the crux of an FCA violation is intentionally deceiving the government, no violation exists where relevant government officials are informed of the alleged falsity, thus precluding a determination that the government has been deceived. *U.S. ex rel. Laird v. Lockheed Martin Eng'g and Sci. Servs. Co.,* 491 F.3d 254, 262-63 (5th Cir. 2007). Gray does not meet his obligation to produce evidence that Lockheed Martin knowingly presented false claims to NASA. Summary Judgment is appropriate where no reasonable jury could conclude that the knowledge requirement has been met.

**D. Gray Cannot Establish Materiality**

There can be no liability under the False Claims Act unless the fraud at issue was material to the Government's payment of a claim. *See U.S. ex rel. Longhi v. Lithium Power Tech., Inc.,* 2009 WL 1959259, at *7 (5th Cir. July 9, 2009)(The Fifth Circuit's Jurisprudence holds that a false or fraudulent claim or statement violates the FCA only if it is material."). "A material claim is

18

one that is required to be made in order to receive the relevant government benefit." *U.S. ex rel. Marcy v. Rowan Companies, Inc.,* 520 F.3d 384, 389 (5th Cir. 2008). To prevail on materiality, a relator must demonstrate that a "false statement could have influenced the government's payment decision or had the potential to influence the government's decision." *U.S. ex rel. Longhi v. Lithium Power Tech., Inc.,* 2009 WL 1959259, at *7 (5th Cir. July 9, 2009).

In the case at bar, Gray has not shown that Lockheed Martin lied about anything that was material to payment by NASA. The evidence presented by Lockheed Martin shows that information regarding Gray's technology was not material to the Government as Lockheed Martin allowed Gray to present the information to NASA, and NASA repeatedly rejected it.

The Fifth Circuit addressed a similar set of facts in *U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.,* 491 F.3d 254 (5th Cir. 2007). Like this case, Laird concerned a cost-plus=award fee contract between Lockheed Martin and NASA. *Laird,* 491 F.3d at 256-57. The relator in *Laird* produced detailed information about the pertinent contract, and asserted that Lockheed Martin's cost projections submitted to NASA under the contract were false claims or statements under the FCA. *Id.* at 261. In affirming the district court's grant of summary judgment to Lockheed Martin, the Fifth Circuit held that, because the projections were not submitted

19

nor sued for the purpose of calculating Lockheed's award fee payment, " the projections were immaterial as a matter of law. *Id.* Despite testimony that Lockheed Martin had a contractual duty to provide specific projections, and that Lockheed's failure to provide these might be characterized as noncompliance with a contract term, the Fifth Circuit held that the relator had produced insufficient evidence of materiality because there was no nexus between the projections and Lockheed's award fees. *Id.* at 261.

The Court finds that Gray has failed to identify any specific contractual duties implicated by his allegations or explain how Lockheed allegedly failed to comply with the Contract. Accordingly, Gray's claims must be dismissed. Accordingly,

Defendant's Motion for Partial Summary Judgment is **GRANTED.**

New Orleans, Louisiana this 18th day of February, 2010.

UNITED STATES DISTRICT JUDGE